CONAL DOYLE, ESQ., SBN 227554
conal@conaldoylelaw.com
STEPHEN BEKE, ESQ., SBN 290972
sbeke@conaldoylelaw.com
DOYLE LAW, APC
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel: 310-385-0567

[Additional Counsel Identified Below]

Counsel for Plaintiff and the Proposed Class

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| CHARLES SMALL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSAL SERVICES OF AMERICA, and DOES 1-10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

## INTRODUCTION

On behalf of the Allied Universal 401(k) Plan ("Plan"), Charles Small ("Plaintiff"), files this Class Action Complaint against Universal Services of America, LP, ("Universal Services" or "Defendant"), and/or DOES 1-10,

inclusive, for breaching their fiduciary duties of prudence in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

## BRIEF OVERVIEW

1.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in employer-based defined contribution retirement plans as of March 31, 2020, of which $5.6 trillion was held in 401(k) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $28.7 Trillion in First Quarter 2020* (June 17, 2020).

2.      In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

3.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest

known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

4.    Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can and unfortunately often do ***dramatically*** reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and can result in ***vast*** differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

5.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, p. 2 (September, 2019).

6.    Plaintiff is a Plan participant.  As of December 31, 2020, the Plan

had $276,875,951 in assets and 17,513 participants with account balances as of the end of the plan year.   Instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendant and/or DOES 1-10, inclusive, caused the Plan to pay unreasonable and excessive fees and compensation to third-parties for recordkeeping, administrative services, and in some cases for no reason at all.

7.    Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' imprudent conduct. The Plan is entitled to be restored its losses caused by Defendants' imprudence. Plaintiff and all Plan participants are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

8.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

9.    For example, Defendants' did not adhere to fiduciary best practices to control Plan costs when looking at certain aspects of the Plan's administration such as monitoring investment management fees for the Plan's investments, resulting in several funds during the Class Period being more expensive than

identical funds found in similarly sized plans.

10.    To the extent that Defendants made any attempt to reduce the Plan's expenses or to prudently monitor and review the Plan's investment options, Defendants employed flawed and ineffective processes, which failed to ensure that the fees and expenses charged to Plan participants were reasonable.

11.    Defendants' mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Defendants' actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

## JURISDICTION AND VENUE

12.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

13.    This Judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the District in which the Plan is administered (Santa Ana, California).

## THE PLAN

14.    The Plan is a qualified retirement plan commonly referred to as a 401(k) plan.

15.    The Plan is established and maintained under written documents in

accordance with 29 U.S.C. §1102(a)(1).

16.    More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

17.    Eligible current and former employees of Allied Universal are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former Allied Universal employees.  The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plan by Defendants.

18.    In theory, Defendants determine the appropriateness of the Plan's investment offerings, monitors investment performance, and review total plan and fund costs each year.

## THE PARTIES
### *Plaintiff*

19.    Plaintiff is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

20.    In terms of standing, §1132(a)(2) allows recovery for a "plan" and does not provide a remedy for individual injuries distinct from plan injuries. Here, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches.

21.    he Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

22.    Section 1132(a)(2) authorizes any participant to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches and it remains exposed to harm and continued losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

23.    To the extent the Plaintiff must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct.

24.    To establish standing, the Plaintiff need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiff alleges such an injury for his claims here.

25.    More specifically, the Plaintiff has standing because the challenged conduct, including Defendants' actions resulting in Plaintiff and the class members paying excessive recordkeeping and administrative fees, affected all

Plan participants in the same way.

26.    For example, Plaintiff's individual account in the Plan suffered losses because each participant's account was assessed an excessive amount for recordkeeping and administrative fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan and reduced those fees to a reasonable level.

27.    Not only that, Plaintiff and all participants in the Plan suffered financial harm as a result of the imprudent options in the Plan because Defendants' inclusion of those imprudent options deprived Plan participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options and payment of excessive recordkeeping fees.

28.    As a result of Defendants' actions, Plaintiff and Plan participants are entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

///

### *Defendants*

29.     Allied Universal is the Plan sponsor and a statutory fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) it is a named fiduciary under the Plan, (b) it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     The true names and capacities of the defendants sued as DOES 1-10, inclusive, are unknown to Plaintiff; Plaintiff therefore sues those defendants by fictitious names.  Plaintiff is informed and believes that DOES 1-10, inclusive, are individuals, associates, corporations, businesses, divisions, subsidiaries, agents, and/or other entities that are in some fashion legally responsible for the actions, events, and circumstances complained of, and/or were the agents, representatives, or employees of the other defendants, and thus may be financially responsible to Plaintiff for their actions or omissions.  Plaintiff will amend the Complaint to allege the true names and capacities of DOES 1-10 when they have been ascertained.

### *Additional Information on the Plan*

31.     The Plan, established January 1, 2000, is a defined contribution and profit-sharing 401(k) plan.

32.     The Plan is subject to the provisions of ERISA.

33.    Massachusetts Mutual Life Insurance Company is currently the Plan's recordkeeper.

34.    The Plan's assets are held by Reliance Trust Company and participant accounts are maintained by Reliance Trust Company.

35.    Allied Universal employees can participate in the Plan after completing three months of employment.

36.    Participants may contribute, subject to certain limitations, up to a maximum of 100% of pretax annual compensation, but each individual's contributions were limited to $19,500 in 2020. An additional catch-up contribution up to $6,500 was allowed for employees aged 50 and over.

## CLASS ACTION ALLEGATIONS

37.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[1] All persons who were participants in or beneficiaries of the Plan at any time between September 11, 2016, and the present (the "Class Period").

38.    The members of the Class are so numerous that joinder of all members is impractical. According to the 2020 Form 5500 filed with the U.S.

---

[1] Plaintiff reserves the right to revise the proposed class definition in his motion for class certification or subsequent pleadings in this action.

Department of Labor, there were 17,513 Plan participants with account balances, as of December 31, 2020.

39.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries because of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

40.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.      Whether Defendants are fiduciaries of the Plan;

B.      Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.      Whether Defendants failed to adequately monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of all relief.

41.    Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

42.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

43.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## **DEFENDANTS' FIDUCIARY BREACHES**

44.    ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

45.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

46.    As described above, Defendant and/or DOES 1-10, inclusive, were (and still are) fiduciaries of the Plan because:

        A.    they is so named; and/or

        B.    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

C.      they exercised discretionary authority or discretionary control respecting management of the Plan's fess, expenses, and compensation paid to third-parties; and/or

D.      they have discretionary authority or discretionary responsibility in the administration of the Plan.

47.    As fiduciaries, Defendants were/are required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan's fees and expenses, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

48.    "Thus, in deciding whether and to what extent to invest in a particular investment, *a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income*. A decision to make an investment may not be influenced by non-economic factors unless the investment, *when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the

plan." *U.S. Dep't of Labor ERISA Adv. Op*. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

49.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

50.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by

his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

51.    During the Class Period, Defendants did not act prudently or in the best interests of the Plan's participants.

52.    During the Class Period, Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for each of the Plan's investment options. Defendants also caused the Plan and its participants to pay excessive administration fees and excessive compensation to third parties.

53.    As set forth in detail below, Defendants breached fiduciary duties of prudence to the Plan and its participants and beneficiaries, and are therefore liable for their breaches, under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## **SPECIFIC ALLEGATIONS**

### ***Improper Management of the Plan Cost the Plan's Participants Millions in Savings***

54.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment

and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

55.    "The Restatement…instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[2]

56.    "Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

57.    Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major

---

[2]  Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 11, 2022).

source people think they are going to rely on."[3] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

58.    Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and to "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

59.    The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[4] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

---

[3] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited September 11, 2022).

[4] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited September 11, 2022).

60.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from services like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[5]

### *Defendants Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses*

61.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

---

[5]   Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited September 11, 2022).

62.     Virtually all recordkeepers in the marketplace offer nearly identical services.

63.     The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level (*i.e.*, identical) services. As a result of such competition, vendors vigorously compete for business by offering the **best price** when prudent fiduciaries request or negotiate the best price. But absent prudent fiduciaries requesting or negotiating reasonable prices for recordkeeping services, recordkeepers often demand excessive and unreasonable fees for their services – on the theory that if imprudent fiduciaries are willing to pay excessive and unreasonable fees for recordkeeping, so much the better for the recordkeepers who pocket the fees – and the onus is on the fiduciaries to negotiate fair pricing, not on the recordkeepers to do so.

64.     The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

65.     Recordkeeping expenses can either be paid directly on a per-participant basis. Recordkeeping expenses can also be paid indirectly by discretely, in many instances almost imperceptibly, taking money from Plan

participants' investment balances. This is a practice known as revenue sharing (the name is a misnomer because recordkeepers surreptitiously take money from participant investments regardless of whether the investments increase in value of decease in value. There is no actual "revenue sharing.")

66.    Revenue sharing payments are derived from investments within the plan, usually mutual funds. Typically, the recordkeeper will enter into one or more agreements that provide the recordkeeper with a percentage of investments made by Plan participants made through the Plan.

67.    Here, Plan participants pay for record keeping using both a direct per participant annual fee and indirectly via revenue sharing. Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiff is not making a claim against Defendants merely because they used revenue sharing to pay recordkeeping fees. If Defendants make this argument in a motion to dismiss – the argument will be disingenuous.

68.    When revenue sharing is left unchecked, it can be ***devastating*** for Plan participants. "At worst, revenue sharing is a way to hide fees participants pay to invest in retirement plans. Nobody sees the money change hands, and very few understand what the total investment expense pays for – or how much they are actually paying for recordkeeping when the direct expenses and the indirect expenses (revenue sharing) are totaled. Defendants here do not disclose in any

meaningful way to Plan participants how much Plan participants pay in revenue sharing. This is likely because Defendants themselves do not even know what Plan participants pay in revenue sharing. Revenue sharing is a deceptive construct designed to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees."[6]

69.     Because revenue sharing payments are asset based, ***they bear no relation to a reasonable recordkeeping fee.*** They can (and frankly are designed) to provide excessive compensation to recordkeepers. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increases the recordkeeping fees that recordkeepers pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-

---

[6] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited June 24, 2022).

based fees are not monitored, the ***fees skyrocket as more money flows into the Plan.***

70.     This is what has happened here. Defendant reported to the Department of Labor that for the year ending 2016, there was $59,183,693 invested through the Plan. Defendant reported that for the year ending 2021, there was $281,688,673 invested through the Plan. Not only is the recordkeeper getting paid a direct fee for recordkeeping services, but when the revenue sharing compensation is added, the amount of compensation Plan participants pay for recordkeeping is unreasonable, imprudent, and wildly excessive.

71.     It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution

plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

72.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

73.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all fees*, including direct compensation indirect compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

///

74.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

75.    Defendants failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.

76.    More specifically, Massachusetts Mutual Insurance Company has been the Plan's recordkeepers during the entirety of the Class Period.

77.    According to Plan documents obtained thus far, including statutorily required disclosures made to the Department of Labor, Defendants have failed to undertake an RFP in recent years.  If Defendants had undertaken an RFP to compare Massachusetts Mutual Insurance Company's costs with those of others in the marketplace, Defendants would have recognized that Massachusetts Mutual

Insurance Company's compensation for recordkeeping services during the Class Period has been (and remains) unreasonable and excessive.

78.     From 2016 to 2020 the direct annual recordkeeping per participant compensation that Massachusetts Mutual Insurance Company received from Plan participants was as follows:

| Year | Direct Recordkeeping Compensation |
|------|-----------------------------------|
| 2016 | $50.57 |
| 2017 | $31.41 |
| 2018 | $109.60 |
| 2019 | $103.77 |
| 2020 | $78.49 |

79.     This amount does not include indirect compensation that Massachusetts Mutual Insurance Company received via revenue sharing, float, etc. By comparison to other plans, even the naked direct fees are excessive and unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan), and demonstrated that as plans increase in size the costs of recordkeeping generally decrease on a per participant basis—a

classic example of economies of scale. But here the opposite is happening. As Plan assets increase so are recordkeeping fees.

80.    A plan with 200 participants and $20 million in assets, the average recordkeeping and administration cost (through direct compensation) is $12 per participant. 401k Averages Book at 95. A plan with 2,000 participants and $200 million in assets, the average recordkeeping and administration cost (through direct compensation) is $5 per participant. *Id*. at 108. Defendants caused Plan participants to pay excessive fees.

81.    Moreover, Massachusetts Mutual Insurance Company did not receive only the direct compensation set forth above—it received far more compensation for recordkeeping and other administrative services through revenue sharing payments.

82.    As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad

for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

83.     Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014).[7] Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id*.

84.     As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan.

---

[7] Available at: https://blog.alliancebernstein.com/post/en/2014/06/coming-to-grips-with-excess-revenue-sharing (last visited September 11, 2022).

85.     The Plan's total expenses for recordkeeping reveals the true extent of Defendants' fiduciary breaches. The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $200 per participant annually, when a reasonable fee ought to be no more than $25 per participant annually.

86.     Worse yet, here, Defendants agreed that anytime Plan participants deposit or withdraw money from their individual accounts, that the money will first pass through a Massachusetts Mutual Life Insurance Company clearing account.

87.     Defendants agreed Massachusetts Mutual Life Insurance Company could keep all of the interest earned on Plan participant accounts while participant money is in Massachusetts Mutual Life Insurance Company's clearing account (often for several days). That is, Massachusetts Mutual Life Insurance Company is making money off of Plan participant money without providing any actual services for the money. This is another form of indirect compensation that Massachusetts Mutual Life Insurance Company receives as the recordkeeper for the Plan.

88.     However, Defendants have not tracked, monitored, or negotiated the amount of compensation Massachusetts Mutual Life Insurance Company receives from income it earns on Plan participant money (nearly $300,000,000 million

now). Defendants breached their fiduciary duties of prudence by allowing Massachusetts Mutual Life Insurance Company to receive compensation from Plan participants without even knowing the amount of compensation Massachusetts Mutual Life Insurance Company collects from interest on participant money.

89.    The compensation Defendants allowed the Plan to pay Massachusetts Mutual Life Insurance Company is far greater than recognized reasonable rates for a plan with nearly $300 million in assets. Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the services provided to the Plan by Massachusetts Mutual Insurance Company but at a fraction of the cost to Plan participants. Massachusetts Mutual Insurance Company performs task for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management (computing, tabulating, data processing, etc.)

90.    The services that Massachusetts Mutual Insurance Company provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeepers and taken corrective

action.   Defendants' failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

91.    Looking at recordkeeping costs for other plans of a similar size as of 2019 shows that the Plan was paying higher recordkeeping fees than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration fees.    The chart[8] below analyzes a few well managed similar plans:

| Name of Plan | Total Number of Participants | Dollar Value of Plan Assets | Total Reported Recordkeeping and Administrative Service Costs | Recordkeeping and Administrative Service Costs on a Per-Participant Basis[9] |
|---|---|---|---|---|
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | $27 |
| Kaiser Permanente Supplemental Savings | 46,943 | $3,793,834,091 | $1,526,401 | $33 |

[8] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available
[9] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2019-instructions.pdf.

| and Retirement Plan | | | | |
|---|---|---|---|---|
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 |

92.     Thus, if the Plan were a standalone plan, with over 20,000 participants and over $276,875,951 dollars in assets in 2020, Defendants should have been able to negotiate a total recordkeeping cost anywhere from $21 per participant to $33 from the beginning of the Class Period to the present.

93.     In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Defendants could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. Defendants failed to do so and, as a result, violated their fiduciary duties under ERISA.

94.     This lawsuit is especially important as well because it will serve as a catalyst for positive changes and improvements to the administration of the Plan. Defendants, fiduciaries to the Plan, can and should immediately take proactive measures to negotiate and secure reasonable fees and expenses for the Plan. Any refusal to do so, would only further damage the Plan and its participants and evince further breaches of ERISA's stringent fiduciary duties. Prudent

administration of the Plan going forward will protect millions of hard earned and much needed retirement savings for Plan participants.

## FIRST CLAIM FOR RELIEF

### *Breach of the Duty of Prudence*

95.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

96.     As fiduciaries of the Plan, Defendant and/or DOES 1-10, inclusive, are subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties include managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

97.     Defendant and/or DOES 1-10, inclusive, breached these fiduciary duties by failing to monitor or control the grossly excessive compensation paid for recordkeeping services.

98.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant and/or DOES 1-10 complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available for retirement.

99.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant and/or DOES 1-10 are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for the breaches of Defendant and/or DOES 1-10, inclusive, as set forth in the Prayer for Relief.

### SECOND CLAIM FOR RELIEF
### *Failure to Adequately Monitor Other Fiduciaries and Service Providers*

100.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

101.     Defendant and/or DOES 1-10, inclusive, are the named fiduciaries with the overall responsibility for the control, management, and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Defendant and/or DOES 1-10, inclusive, are the Administrators of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan.

102.     A monitoring fiduciary must ensure that Plan fiduciaries and service providers receive reasonable compensation for services rendered to the Plan.

103.    Defendant and/or DOES 1-10, inclusive, breached their fiduciary monitoring duties by, among other things:

A.    Failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

B.    Failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees;

C.    Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

D.    Failing to ensure that the monitored fiduciaries and service providers considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

E.    Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

104.     Had Defendant and/or DOES 1-10, inclusive, discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiff, and the other Class Members lost millions of dollars of retirement savings.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

1.     Find and declare that Defendant and/or DOES 1-10, inclusive, have breached their fiduciary duties, as described above;

2.      Find and adjudge that Defendant and/or DOES 1-10, inclusive, are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.     Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant and/or DOES 1-10, inclusive, to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

5.      Remove the fiduciaries who have breached their fiduciary duties, and

enjoin them from future ERISA violations;

6.    Surcharge against Defendant and/or DOES 1-10, inclusive, and in favor of the Plan, all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.    Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.    Certify the Class, appoint the Plaintiff as class representatives, and appoint their counsel as Class Counsel;

9.    Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.    Order the payment of interest to the extent it is allowed by law; and

11.    Grant other equitable or remedial relief as the Court deems appropriate.

DATED: October 11, 2022            Respectfully submitted,


                                                DOYLE LAW, APC


                                                By: */s/ Conal Doyle*_____
                                                CONAL DOYLE

                                                MARC R. EDELMAN *(pro hac vice pending)*
                                                MORGAN & MORGAN, P.A.
                                                201 N. Franklin Street, Suite 700
                                                Tampa, Florida 33602

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Telephone: 813-223-5505
Facsimile: 813-257-0572
E-mail: MEdelman@forthepeople.com

BRANDON J. HILL *(pro hac vice pending)*
LUIS A. CABASSA *(pro hac vice pending)*
WENZEL FENTON CABASSA, P.A.
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Telephone: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: jcornell@wfclaw.com
Email: rcooke@wfclaw.com
Email: lcabassa@wfclaw.com
Email: gnichols@wfclaw.com
Email: tsoriano@wfclaw.com

MICHAEL C. MCKAY *(pro hac vice pending)*
MCKAY LAW, LLC
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law

*Attorneys for Plaintiff and the Proposed Class*